IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL JOHNSON, | : | Civil Action |
| *Petitioner*, | : | |
| | : | |
| v. | : | |
| | : | |
| SUPERINTENDENT LEE ESTOCK | : | No. 19-5093 |
| *et al.*, | : | |
| *Respondents*. | : | |

## RESPONSE TO OBJECTIONS TO
## REPORT AND RECOMMENDATION

On August 11, 2022, Magistrate Judge Lynne A. Sitarski issued a detailed report and recommendation, ECF No. 13, to deny petitioner Darrell Johnson's petition for a writ of habeas corpus. Johnson, through counsel, has filed objections. ECF No. 14.[1] The pertinent facts and procedural history are set forth in the report and recommendation.

Johnson raises three objections to Judge Sitarski's proposed disposition of his habeas petition. In his first objection, Johnson contends that Judge Sitarski erred in concluding that Johnson did not suffer prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), as a result of trial counsel's failure to object to an erroneous reasonable-doubt jury instruction. ECF No.

---

[1] When a proceeding has been referred to a United States magistrate judge for a report and recommendation under 28 U.S.C. § 636(b), the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings and recommendations, or may receive further evidence or recommit the matter to the magistrate judge. *See id.*

14 at 9. In his second objection, Johnson argues that Judge Sitarski incorrectly concluded that he was required to demonstrate prejudice because an unconstitutional reasonable-doubt jury instruction creates a presumption of prejudice. *Id.* at 9–10. Johnson's third objection is not an objection to the report and recommendation's basis for denying his claim for habeas relief. Instead, it asserts that he should be granted a certificate of appealability on his claim. *Id.* at 10–11.

For the most part, Johnson's objections repeat arguments already considered and rejected by Judge Sitarski. In the respondents' view, the magistrate judge correctly concluded that Johnson's claim does not warrant habeas relief.[2] Thus, for the reasons set forth in the report and recommendation, Johnson's objections should be overruled.

---

[2] In their previous response, respondents argued that Johnson's ineffective assistance of counsel claim was both procedurally defaulted without excuse and without merit. ECF No. 9. Specifically, respondents argued that trial counsel's performance was not deficient, and that Johnson was not prejudice. *Id.* at 13–19. However, on further review and consistent with their position in other cases in both state and federal courts, respondents concede that counsel's failure to object to the erroneous jury instruction constituted deficient performance. Respondents also acknowledge that federal courts have repeatedly found that the failure to object to nearly identical reasonable-doubt instructions from the same trial court was deficient performance. *See Moore v. Rivello*, No. 20-838, 2022 WL 1749250, at *6–*16 (E.D. Pa. 2022); *Brown v. Kauffman*, 425 F.Supp.3d 395, 411 (E.D. Pa. 2019); *Corbin v. Tice*, No. 16-4527, 2021 WL 2550653, at *5 (E.D. Pa. June 22, 2021) (unpublished); *Brooks v. Gilmore*, No. 15-5659, 2017 WL 3475475, at *6–7 (E.D. Pa. Aug. 11, 2017) (unpublished); *McDowell v. DelBalso*, No. 18-1466, 2019 WL 7484699, at *5 (E.D. Pa. Jan. 23, 2019), *report and recommendation adopted*, No. 18-1466, 2020 WL 61162 (E.D. Pa. Jan. 3, 2020) (unpublished); *Shields v. Smith*, No. 18-750, 2020 WL 6929097, at *13–15 (E.D. Pa. Oct. 5, 2020), *report and recommen-*

I. **Although the evidence presented at trial was not overwhelming, the report and recommendation correctly concluded that Johnson was not prejudiced by the faulty reasonable-doubt jury instruction.**

In his first objection, Johnson argues that the report and recommendation erroneously concluded Johnson did not suffer prejudice as a result of trial counsel's failure to object to the erroneous reasonable-doubt jury instruction. ECF No. 14 at 9. Johnson argues that reasonable doubt was central to the case because of challenges to critical testimony at trial. *Id.* He claims all of the critical testimony was presented through statements to police during trial and that two of the three key witnesses explained they were substantially intoxicated at relevant times. *Id.* Finally, Johnson notes one of the witnesses did not testify at trial and that, instead, his testimony from a prior hearing was read into evidence. *Id.*

Although all three eyewitnesses recanted at least in part at some point during the proceedings, the evidence of Johnson's guilt was substantial, as the report and recommendation noted. The prosecution relied primarily on the testimony and statements of three civilian witnesses, two of whom witnessed the actual shooting and one of whom Johnson confessed to immediately after the shooting. One witness, despite initially appearing to recant, was ultimately rehabilitated on the stand. And while two other eyewitnesses were not rehabilitated on the stand, at least one's recantation was

---

*dation adopted*, No. 18-750, 2020 WL 6888466 (E.D. Pa. Nov. 24, 2020) (unpublished); *but see Green v. Smith*, No. 18-4734, 2020 WL 10058148, at *11 (E.D. Pa. 4, 2020), *report and recommendation adopted*, No. 18-4734, 2021 WL 2454482 (E.D. Pa. June 16, 2021) (unpublished). *Cf. Baxter*, 99 F.3d at 546–47 (assuming that counsel's failure to object to the jury instruction was deficient performance).

3

likely explained by her own testimony about witness intimidation. All three of the witnesses were interviewed either immediately after the shooting or within weeks of it. All three of the witnesses knew and were close with Johnson. And although the witnesses' testimony about using narcotics and drinking the night of the shooting could have been viewed by the jury as affecting their ability to observe and remember the events of that night, the witnesses' familiarity with Johnson undermined any argument they misidentified him as the shooter. Furthermore, the physical evidence was consistent with the eyewitnesses' description of the shooting, further undermining any claims that the witnesses were impaired to the point of being unable to observe or remember the event.

Because respondents did not address in-depth the strengths and weaknesses of the evidence of guilt presented at trial in their previous response, they do so now.

1. **Witness Isaac Whitaker**

Isaac Whitaker testified that he was close with Johnson, describing him as a cousin, though not a blood relation. N.T. 3/8/10 at 34–35. When he first took the stand, Whitaker testified consistently with his police statement. On the night in question, he was at a party with one of the eyewitnesses, Curtis Johnson,[3] and Johnson. *Id.* at 38–40. Later that night, Whitaker was driving Curtis and Johnson around North Philly when Whitaker heard a gunshot, saw Johnson with a gun, and realized one of the car windows was shattered. *Id.* at 40–45. Johnson said that he had accidentally shot at the window

---

[3] Because the petitioner Johnson and the eyewitness Curtis Johnson share the same last name, respondents refer to the eyewitness by his first name, Curtis, to avoid confusion.

and Whitaker told him to get out of the car. *Id.* at 46. Johnson took the gun with him. *Id.* Whitaker returned to where he had previously parked and cleaned the glass out of his car, helped by Curtis and the victim. *Id.* at 46–47.

Whitaker's testimony then diverged from his police statement; he claimed he then went to sleep and did not wake up until the police arrived the next morning. *Id.* at 50. The prosecution confronted Whitaker with his statement to police, including that he spoke with Johnson immediately after the shooting and that Johnson confessed to shooting the victim, and Whitaker agreed that it was his statement, his signature on both the statement and the picture of Johnson he identified as the shooter, and that he had attempted to be accurate when speaking to the police. *Id.* at 52–74.

Whitaker then agreed that he told the police that after cleaning up the glass, he returned to the party and met up with Curtis and Johnson. *Id.* at 63. Johnson was looking out the window, saw the victim walk by, and walked out of the house with Curtis following him. *Id.* Whitaker knew that the victim owed Johnson money for a gun. *Id.* at 63–64. Whitaker heard Johnson calling the victim's name followed by an argument between the victim and Johnson, though he could not hear what was said. *Id.* at 64. Curtis then came back into the house, later followed by Johnson. *Id.* Curtis confronted Johnson, asking him why he shot the victim, which was the first Whitaker learned of the shooting. *Id.* Both Curtis and Whitaker questioned Johnson about why he shot the victim. *Id.* Johnson did not say why, though Whitaker believed it was because of the gun. *Id.* Johnson said that he shot the victim and that he was dead but did not say anything else. *Id.* Eventually

Whitaker went to sleep and when he woke up, police officers were at the door. *Id.* at 65.

Ultimately, Whitaker testified that he did remember speaking with Johnson after the shooting and that Johnson admitted to killing the victim, but that at trial he remembered the conversation happening a day or two after the shooting rather than immediately after. *Id.* at 75–76. He also could not remember what type of gun Johnson had, although in his police statement he gave the type. *Id.* at 76. Other than remembering the type of gun and when he spoke with Johnson, Whitaker testified that his memory of the events at trial was the same as what he told police in his statement. *Id.* at 77.

Whitaker also testified he had smoked marijuana and drank on the night in question. *Id.* at 42–44, 64. He also testified that he had a pending conviction, but that the prosecution had made no promises to him in exchange for his testimony. *Id.* at 78–79.

### 2. Eyewitness Tiana Thomas

Tiana Thomas testified that at the time of the shooting, she had known Johnson for about seven years and had seen him almost daily in that time. N.T. 3/10/10 at 26. But immediately after taking the stand, Thomas began to recant, claiming that she did not remember where she was the night of the shooting. *Id.* at 26–27. She then testified that on the night in question, she was at a bar with a friend, that she left, but that she did not see anything happen at that time. *Id.* at 31–32. When asked if she wanted to be in court that day and whether there was anything affecting her desire to testify, she responded that she did not want to be in court, that people were saying things on Facebook that affected her willingness to testify, that her tires had be slashed two days earlier and her windows broken. *Id.* at 32–38. She later

6

also testified that she had been offered and accepted witness relocation services. *Id.* at 74–75.

The prosecution questioned Thomas about her statement to police, which she agreed she gave approximately two weeks after the night in question. *Id.* at 38–39. Initially, Thomas denied signing the statement and said that she did not give the police the name on the statement, Kiarra Morris. *Id.* at 40. Eventually, Thomas admitted that her signature was on the statement and that other biographical information was correct. *Id.* at 41–44. The prosecution then read from her statement that on the night in question, she was walking down the street with a friend, and she saw three men who she knew and identified as Johnson, the victim, and a man named William. *Id.* at 47–48. Johnson had his arm around the victim. *Id.* at 48. He then reached into his waist area and pulled out a gun. *Id.* Thomas saw the spark from the gun, heard the gunshot, and then saw the victim fall face-forward onto the ground. *Id.* Johnson then ran away. *Id.* at 48–49. Thomas also stated that she had heard that Johnson shot the victim because of a dispute over a gun. *Id.* at 50. Thomas did not claim at trial that the police forced her to give a false statement and did not make any allegations of police misconduct.

Although Thomas denied telling the police that she saw Johnson shoot the victim, she agreed that she had signed and circled a photograph of Johnson. *Id.* at 51–52. She also did not deny that she gave other responses in the statement, including that she had read over her statement at the time of the interview, agreed everything in it was true and correct, and signed it. *Id.* at 54.

Thomas testified that she had previous *crimen falsi* convictions. *Id.* at 58–63. She also testified during cross-examination that on the night in question, she drank 13–14 shots of alcohol, smoked marijuana, and had taken Xanax.[4] *Id.* at 63–64.

Detective George Fetters, who interview Thomas, testified that Thomas did not appear intoxicated or high during the interview. N.T. 3/10/10 at 185–86. He also testified that the Friday before trial, Thomas appeared upset and that she did not want to participate in any aspect of the case. *Id.* at 187–88. A few days later, during a phone call with Fetters, Thomas was upset, crying, and seemed scared. *Id.* at 188–89.

### 3. Eyewitness Curtis Johnson

Curtis Johnson testified during Johnson's preliminary hearing but did not testify at trial. The trial court allowed the prosecution to present Curtis's preliminary hearing testimony and statement because of his unavailability. N.T. 3/10/10 at 126–28.

During the preliminary hearing, as read into the record at trial, Curtis testified that Johnson was his cousin and that he had known him his entire life. *Id.* at 131. He testified that on the night in question, Curtis was at his girlfriend's house with Isaac Whitaker. *Id.* at 131–32. He then began to recant, leading the prosecution to confront him with his police statement from the day of the shooting. *Id.* at 136. Curtis agreed that he gave a statement to

---

[4] Thomas testified she drank 13–14 shots the night of the shooting, but then later said that the detective who took her statement approximately two weeks later should have known she was intoxicated when she gave her statement because he should have been able to smell the alcohol. *Id.* at 75. Other than that comment, she did not indicate she was intoxicated while giving her statement.

police and signed it, that the statement reflected what he told police, but that the police forced him to say Johnson shot the victim. *Id.* at 136–37, 139–49. He testified that the police told him that they had Johnson in another room and that Johnson was accusing Curtis of shooting the victim. *Id.* at 172. When asked if he had signed his initials on every page of the statement, Curtis testified that he had, but that he did because he was scared. *Id.* at 149.

Curtis testified that some details in the statement were correct, including that he had seen Johnson and the victim the night of the shooting, and that he signed his responses. *Id.* at 149–51. Curtis denied remembering telling the police that he confronted Johnson about shooting the victim. *Id.* at 149–50. He also denied telling the police that he saw Johnson shoot the victim and that he did not cooperate at first because he was afraid Johnson would come after him. *Id.* at 149–53.[5] Curtis agreed he identified a picture of Johnson and signed it. *Id.* at 152–53.

Detective William Holmes, who interviewed Curtis Johnson, testified at trial that he appeared nervous and reluctant to talk to the police when he was interview. 3/11/10 at 90.

**4. Other evidence presented at trial.**

Various police officers and detectives testified during the trial. In addition to the testimony of Detectives Holmes and Fetters discussed above, the testimony included the following:

---

[5] Curtis initially told the police that he did not witness the shooting and only discovered the victim was shot when he and a friend were walking down the street and found the body. N.T. 3/11/10 at 85–88.

The forensic pathology expert testified that the injuries on the body were consistent with the victim falling face forward to the ground after being shot, consistent with the eyewitnesses' testimony. *Id.* at 217–25.

The firearms identification expert testified that one fired cartridge casing was recovered, that it was fired from a semiautomatic pistol, and that the casing was consistent with the eyewitnesses' testimony that a single shot was fired. *Id.* at 20–22.

Finally, Officer Anthony Washington, who responded to the scene of the shooting, testified that he found the victim lying in the street facedown. *Id.* at 29–30. When he later went to get Isaac Whitaker to bring him in to be interviewed, he observed car glass in the street and a car with a window missing. *Id.* at 36–37.

* * *

The Commonwealth acknowledges that the evidence is not overwhelming. The witnesses' recantations, Thomas and Whitaker's testimony about using narcotics and drinking the night of the shooting, and Thomas's *crimen falsi* convictions all affect the probative force of their testimony. And the Commonwealth acknowledges that the issue of reasonable doubt was important to the defense's theory. But, as the report and recommendation noted, the witnesses' familiarity with Johnson and their consistent identification of him as the shooter make their testimony particularly strong. ECF No. 14 at 20. The witnesses' description of the shooting was also corroborated by the physical evidence. And despite the challenges to the witnesses' credibility, the jury did not appear to struggle with reaching a guilty verdict: the jury began deliberating in the afternoon and returned a guilty verdict the next day after asking only one question. *See* Secure Docket CP-51-

CR-0010412-2008 at 21–22; N.T. 3/15/10 at 88. Given the substantial evidence of Johnson's guilt, Johnson has not demonstrated prejudice. *See Baxter*, 998 F.3d at 549 (holding that there was no prejudice where multiple eyewitnesses who had known the petitioner for years identified him as the shooter and where there was evidence of flight); *Saranchak v. Secretary, Pa. Dept. of Corrections*, 802 F.3d 579, 592 (3d Cir. 2015) (holding that there was no prejudice "given the strength of the Commonwealth's case").

Johnson's first objection to this claim should be overruled.

## II. Consistent with binding Third Circuit precedent, the report and recommendation correctly concluded that prejudiced is not presumed.

The report and recommendation correctly concluded that, consistent with binding Third Circuit precedent, prejudice is not presumed when a petitioner raises a claim of ineffective assistance of counsel for failing to object to an erroneous reasonable-doubt jury instruction. ECF No. 13 at 17–18; *see also Baxter v. Superintendent Coal Township SCI*, 998 F.3d 542, 548 (3d Cir. 2021). Johnson's second objection should be overruled.

## CONCLUSION

For the reasons set forth above and in the report and recommendation, Johnson's objections should be overruled, the report and recommendation should be approved and adopted, and the application for a writ of habeas corpus should be denied.

Respectfully submitted,

*/s/ Shoshana D. Silverstein*
SHOSHANA D. SILVERSTEIN
Assistant District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2022, a copy of the foregoing response was served on all counsel of record via the Court's electronic filing system.

Respectfully submitted,

/s/ *Shoshana D. Silverstein*
SHOSHANA D. SILVERSTEIN
Assistant District Attorney